IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANTONIO CRADDOCK, | ) | Case No. 1:21-CV-00821 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Antonio Craddock, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act.  Craddock challenges the Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ: (1) misevaluated his mental health impairments under Medical Listings 12.04 and 12.06, (ii) erred in finding his subjective symptoms complaints inconsistent with the medical record, and (iii) misevaluated his residual functional capacity limitations.  Because the ALJ applied the proper legal standards, or harmlessly erred in doing so, and reached a decision supported by substantial evidence, the Commissioner's final decision denying Craddock's application for SSI must be affirmed.

## I.       Procedural History

Craddock reapplied[1] for SSI on November 20, 2017.  (Tr. 170-175).[2]  Craddock alleged

that he became disabled on August 8, 2014 due to: (i) congestive heart failure, (ii) type 2

diabetes, (iii) bipolar disorder, and (iv) "grief depression."  (Tr. 189, 193).  The Social Security

Administration denied Craddock's claims initially and upon reconsideration.  (Tr. 92-100,

102-117).  Craddock requested an administrative hearing.  (Tr. 127).

ALJ George D. Roscoe held a hearing on October 31, 2019 and denied the claim in a

December 4, 2019 decision.  (Tr. 10-22, 48-70).  In doing so, the ALJ determined at Step Three

of the sequential evaluation process that Craddock did not meet the medical listing requirements

for Listing 12.04 for depressive, bipolar, and related disorders or Listing 12.06 for anxiety and

obsessive-compulsive disorders.  (Tr. 15-16).  The ALJ also determined at Step Four that

Craddock had the ability to perform medium work, except for:

> [N]o climbing of ladders, ropes or scaffolds; up to frequent climbing of ramps and stairs,
> balancing, stooping, kneeling, crouching and crawling; no exposure to hazards (heights,
> machinery, commercial driving); and mental limitations that he perform simple, routine
> tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes)
> involving superficial interpersonal interactions (no arbitration, negotiation or
> confrontation), and no interaction with the general public as a job requirement.

(Tr. 16-17).  Based on vocational expert testimony that a hypothetical individual with

Craddock's age, experience, and RFC could work as a linen room attendant or laundry worker,

and, even if restricted to performing light work, the hypothetical individual could work as a

marker or "Checker I," the ALJ determined that Craddock was not disabled.  (Tr. 21).  On

---

[1] Craddock previously applied for SSI in August 2014, claiming a disability onset date of August 22,
2014.  That application was denied after ALJ review on September 2, 2016.  The ALJ on the new
application found that there was new and material evidence that provided a basis for finding different
severe impairments and RFC for Craddock and, thus, the ALJ was not barred by those findings in
Craddock's prior decision.  (*See* Tr. 11).  Neither party contests the ALJ's determining in this regard.  *See*
*generally* ECF Doc. 14-1; ECF Doc. 16.
[2] The administrative transcript appears at ECF Doc. 8.

August 21, 2020, the Appeals Council declined further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On April 19, 2021, Craddock filed a complaint to obtain judicial review.[3]  ECF Doc. 1.

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Craddock was born on October 4, 1979 and was 34 years old on the alleged onset date. (Tr. 189).  Craddock finished the eleventh grade in 1997 but did not graduate.  (Tr. 194).  He had specialized job training in horticulture and had prior work with a temp agency.  *Id.*

### B.    Relevant Medical Evidence

On July 9, 2015, Craddock was placed with FrontLine Services ("FrontLine") for mental health treatment and other services.  (Tr. 542).  He was diagnosed with unspecified schizophrenia and reported having a history of "bipolar grief depression and schizophrenia."  *Id.* He also endorsed symptoms of depression, post-traumatic stress disorder ("PTSD"), and auditory hallucinations.  *Id.*  It was noted that Craddock had recently been hospitalized "for voices" and was discharged with an Abilify prescription, which he indicated helped with his depression symptoms and auditory hallucinations.  *Id.*  The doctor continued his medication and instructed him to see a case manager about his housing needs and other services.  *Id.*

On January 19, 2017, Craddock met with FrontLine staff to assist with obtaining mental health services and was instructed to discharge himself from one agency to be able to start the intake process with FrontLine.  (Tr. 457-458).  The staff member reviewed Craddock's housing situation, noting that he was unable to work, had no income, was not eligible for non-employment income, and had been chronically homeless.  (Tr. 517).

---

[3] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 9.

On January 25, 2017, Craddock completed an assessment of his stress-associated symptoms, indicating that in the past month he had been extremely bothered by each of the 20 symptoms mentioned. (Tr. 534). He also underwent an initial diagnostic assessment with FrontLine. (Tr. 519). Craddock reported that his most critical needs were assistance with his chronic homelessness and mental illness, noting a recent hospitalization for suicidal ideation. *Id.* He indicated that he had stayed at shelters, group homes, or with friends and family and had severe depression with agitation, frequently heard voices, and had previously had suicidal thoughts. *Id.* He reported that, during a one-month period, he experienced grossly disorganized behavior and auditory and visual hallucinations, and since their onset his level of functioning in work, interpersonal relationships, and self-care had diminished. *Id.* The therapist noted that Craddock was participative, was dressed appropriately, and had fair hygiene, organized thoughts, normal speech, little insight into the seriousness of his mental illness, mildly impaired judgment. *Id.* He also could recall two out of three items after a two-minute delay and recalled basic facts. *Id.* Craddock was assessed to meet the criteria for schizophrenia. (Tr. 519-520).

On January 26, 2017, Craddock underwent a mental health assessment and final intake assessment. (Tr. 521-528). He reported feeling sad and fearful and having auditory and visual hallucinations. (Tr. 527). The therapist, generally, observed the same conditions as the day prior, adding that Craddock had normal motor activity, an average demeanor, full affect, average intelligence, a perseverant thought process, and the ability to abstract. *Id.*

In his final intake assessment, Craddock indicated that he had taken special education classes in school and had prior treatment and/or diagnoses for type 2 diabetes, congestive heart failure, schizophrenia, major depressive disorder, and psychosis. (Tr. 521-522). He asserted that he was unable to work because of his mental illness, which caused a lack social skills and

4

interpersonal relationship activity.  (Tr. 522).  He also reported the following depression

symptoms: (i) dysphoria, (ii) anhedonia, (iii) irritability, (iv) fatigue, (v) hopelessness,

(vi) decreased concentration, (vii) feelings of worthlessness, (viii) changes in his sleep, and

(ix) suicidal ideation.  (Tr. 522-523).  At that time, he specifically experienced difficulty getting

out of bed, a lack of concentration, feelings of hopelessness and helplessness, an increased need

for sleep, irritability, anhedonia, and dysphonia.  (Tr. 523).  He reiterated his hallucinations and

grossly disorganized behavior.  (Tr. 524).  The therapist noted that he displayed inappropriate

affect and lacked insight or awareness of his disorder.  *Id.*  Craddock agreed to FrontLine's

housing and benefits management services, group psycho-education treatment, substance abuse

treatment, and counseling.  (Tr. 524).

On February 1, 2017, Craddock had a psychiatric assessment with FrontLine.  (Tr. 537).

He reported the same depression symptoms, including auditory hallucinations, affective

instability, low tolerance for frustration, hypervigilance, and avoidance.  *Id.*  His medication

helped with his hallucinations.  *Id.*  The nurse practitioner observed that Craddock was in a

moderate level of distress, but had an engaged attitude, calm behavior, constricted affect,

organized thought process, average cognition, good concentration, concrete abstraction, partial

insight, mildly impaired judgment, and normal speech and thought content.  (Tr. 539-540).

On February 6, 7, and 9, 2017, Craddock had supportive treatment with FrontLine staff.

(Tr. 461-468, 529-30).  He became upset when his housing situation was discussed, complaining

that housing was not immediately available or about his treatment at prior group homes and

shelters.  (Tr. 462, 466-468).  During a mental health assessment, Craddock was observed to be

well-groomed and otherwise normal or average, except he had a constricted affect, organized

thought process, partial insight, mildly impaired judgment, and cooperative behavior. (Tr. 529-530).

From February 11 to 13, 2017, Craddock was hospitalized for pain and swelling in his groin. (Tr. 552-564). On examination, he was generally noted as normal, except for the erythema and warm, mild tenderness on his left inner thigh. (Tr. 554, 557-558, 562). He was discharged on being diagnosed with cellulitis. (Tr. 564).

On February 14, 2017, Craddock was referred to FrontLine's main office for being "very depressed" and anxious; it was thought he could be entered into the crisis stabilization unit to monitor his health. (Tr. 503). Shortly thereafter, Craddock was viewed as threatening a staff member regarding housing issues. (Tr. 451). In a group session later that day, Craddock was noted as participating in a card game, appearing to be in a good mood, laughing, and socializing. (Tr. 491). In staff discussions about Craddock's housing situation, it was noted that he had yelled and gotten angry with staff at other homes, but the plan was for him to remain for three days to monitor his health and then return to a shelter. (Tr. 505-506).

That afternoon, Craddock underwent a crisis assessment, reporting that he experienced a depressed mood most of the day, significant changes in his weight, insomnia or hypersomnia, fatigue nearly every day, feelings of being drained and hopelessness, and panic attacks "all the time." (Tr. 481). He noted he could do activities he enjoyed. *Id.* Craddock also reported having had a mild heart attack in June 2015, being raised in an abusive environment, experiencing the violent death of family and friends, and witnessing violence in prison. (Tr. 483). The nurse observed that he had average concentration, no mania or hypomania symptoms, multiple worries, auditory hallucinations, and, during a second assessment, was oriented; appropriate, purposeful, and responsive in his behavior; had normal speech and thinking; appropriate speech content;

6

impaired judgment; impulse control issues; and the ability to form reasonable judgments to evaluate observations and information . (Tr. 481-482, 485-487). The nurse also noted that Craddock had borderline intellectual functioning or mental retardation, capacity for abstraction, an appropriate fund of information, and "ok" memory and concentration. (Tr. 486). She noted that Craddock did not trust easily and reported hearing voices since childhood, and she diagnosed him with PTSD and schizophrenia. (Tr. 486-487).

Following his evaluation, Craddock underwent a psychiatric assessment for the crisis stabilization unit with a psychiatrist. (Tr. 507-511). The psychiatrist observed that Craddock was in a low level of distress, and had a good appearance, an engaged attitude, calm behavior, normal speech, euthymic affect, an organized thought process, hallucinations, average cognition, good concentration, intact abstraction, partial insight, and intact judgment. (Tr. 507-508). Craddock reported that his chronic auditory hallucinations were manageable with his present medication, and that he had a falling out with the staff at his prior group home because he felt they misunderstood his congestive heart failure. (Tr. 509). He also noted smoking 10 cigarettes a day but was reluctant to quit. (Tr. 510). The psychiatrist's impression was that Craddock had schizophrenia and nicotine-use disorder. (Tr. 510).

On February 15, 2017, while at the crisis unit, Craddock reported in a counseling session that he had help since 2014 for his gallbladder, congestive heart failure, diabetes, and elevated creatine kinase levels in his blood. (Tr. 488). He expressed that he would prefer a group home, and he was told of the plan to discharge him in a few days. *Id.* During a group session, Craddock shared information and verbalized understanding of the content. (Tr. 493). The nurse observed that Craddock socialized with others and stated he had a good day. (Tr. 494-495).

From February 16 to 17, 2017, Craddock remained at the crisis unit. (Tr. 449, 473-476, 496-502). During a treatment session on February 16, the topic of Craddock moving to a group home was discussed and Craddock demanded to speak with another individual, to have a new case officer, and began to use "inappropriate language." (Tr. 474, *see also* Tr. 499). The staff left the unit due to Craddock being irate and "unsafe to assist to meetings." (Tr. 474). At a later counseling session, the staff noted that Craddock was initially argumentative, saying he was discriminated against due to his medical issues, but later became cooperative. (Tr. 498). It was noted that, because of his behavior, the police were almost called, and Craddock was told that he needed to leave on February 17. (Tr. 449, 476). On the morning of February 17, Craddock was observed to be talkative with his peers, have good behavioral control, and have insight as to his tone of voice and its effect on others. (Tr. 501). He was discharged later that day. (Tr. 502).

On February 17, 2017, Craddock was seen at the Cleveland Clinic, reporting that he had been hearing "really loud voices" and he had been hearing voices since the previous June. (Tr. 710). On examination, he was observed to be alert, oriented, well-groomed, cooperative, and having a flat affect, normal speech, and normal thoughts. (Tr. 711). He was noted as a candidate for admission with a diagnosis of bipolar disorder with psychotic features. (Tr. 712).

On February 18, 2017, Craddock was seen at Lutheran Hospital, reporting auditory hallucinations. (Tr. 675). He was noted as being calm and cooperative and reporting that the voices he heard were not telling him to do anything. (Tr. 675, 679). On examination, the doctor noted that Craddock was generally normal physically; but, psychiatrically, observed that Craddock was agitated, was actively hallucinating, and had a blunted affect, tangential speech, paranoid thought content, normal cognition, and normal memory. (Tr. 677). The doctor diagnosed him with bipolar disorder and psychotic features, and Craddock was admitted to the

8

psychiatric unit.  (Tr. 678).  Craddock then had a consultation with Gopal Kapoor, M.D., who noted that Craddock was generally normal and determined that Craddock had systolic congestive heart failure, gastroesophageal reflux disease symptoms ("GERDS"), diabetes, and insomnia, which were monitored or stable with medication.  (Tr. 678-679).

Later, the doctor reevaluated Craddock and observed him to be well-groomed, fully oriented, and to have appropriate behavior, normal speech, a depressed and overwhelmed mood/affect, racing thoughts, paranoid thought content, poor insight, intact memory/cognition, and normal psychomotor activity.  (Tr. 687-688).  He was assessed with schizoaffective disorder of a depressed type, his medication was increased, and he was to participate in group therapy as tolerated.  (Tr. 688).  A later progress note indicated that Craddock had a flat affect with withdrawn demeanor and expressed feeling some paranoia where he felt people were watching him, but he was vague and gave the nurse conflicting reports.  (Tr. 691-692).

From February 19 to 22, 2017, Craddock remained at Lutheran Hospital.  (Tr. 692-707). During a therapy session on his first day, it was noted that he had difficulty engaging, made poor eye contact, was guarded, provided superficial answers, and verbalized auditory hallucinations. (Tr. 695).  Subsequently, however, Craddock was observed to be oriented and have appropriate behavior, normal speech, appropriate mood, flat affect, coherent thoughts, fair insight and judgment, and normal psychomotor activity.  (Tr. 698, 703).  His last two days, he did report that his depression was 7 to 8 out of 10 and his anxiety was a 4 to 5 out of 10.  (Tr. 704-707). Craddock was also noted to become periodically agitated, such as attributing delays in his housing to racial discrimination or expressing paranoid thoughts over the medication or soda staff provided.  (*See* Tr. 697, 700, 707).  When he was discharged, he became angry and agitated, having to be escorted away by security.  (Tr. 707).  The hospital noted that "[w]e observed no

9

psychotic or mood symptoms while on the unit.  It became apparent that issues stem from homelessness and a tendency for the patient to become impatient and believe that accommodations are being denied him." *Id.*

On February 22, 2017, Craddock was seen at MetroHealth Hospital.  (Tr. 549).  He reported concerns about auditory hallucinations and suicidal ideations, indicating that, despite taking medication, his schizophrenia and bipolar disorder symptoms were getting worse. (Tr. 550).  He indicated that his auditory hallucinations told him to harm himself, and he came in when he contemplated jumping in front of the car.  *Id.*  On physical examination, Craddock was reported as normal, and the doctor's impression was that he had schizophrenia.  (Tr. 550-551).

On February 23, 2017, Craddock met with FrontLine staff to coordinate his care and mental health services.  (Tr. 480).  The staff discussed Craddock's anger with the agency, noting that he had been hospitalized a few days prior for aggressive behavior.  *Id.*  The staff indicated that Craddock expressed frustration through yelling and swearing, exhibiting poor regulation of his emotions, and quickly escalating in his agitation.  *Id.*  Craddock expressed that he was not getting the assistance he needed, and the staff noted he externalized his blame for losing his place at one facility and used manipulative statements to get his needs met.  *Id.*  One of the staff members informed Craddock that he did not meet the criteria for the agency's services; he attempted to discredit the statement, asserting that the staff felt threatened by him and he was being discriminated against, but the staff member disagreed with him.  *Id.*  Craddock "abruptly" left and was discharged the following day.  (Tr. 480, 512).  His discharge paperwork indicated that Craddock was "minimally responsive to treatment and exhibited antisocial traits, which inhibited his ability to appropriately interact and have his needs effectively met."  (Tr. 513).

10

On March 16, 2017, Craddock started residing at new supportive housing.  (Tr. 601).
While there, Craddock reported an issue with his mental health medication and indicated he
wished to stop taking it; staff persuaded him to continue but later discovered he had stopped, and
he was sent to the hospital to have his medication reassessed.  (*See* Tr. 603-605).

On March 21, 2017, Craddock was seen at Connections Health Wellness
("Connections"),[4] for a psychiatric evaluation.  (Tr. 800).  In reviewing his social, work, and
mental health treatment history, Craddock reported that he "need[ed]" alcohol and had failed to
quit both that and his marijuana usage.  (Tr. 800-804).  He reported symptoms of depression,
stating that he had a sad mood, a desire to isolate, and did not engage in any activities he
enjoyed, except listening to music.  (Tr. 805).  Specifically, he reported sleeping four hours a
night, and having low energy, difficulty concentrating, restlessness, difficulty making the right
decisions, anger, irritability, feelings of hopelessness, grief and anxiety (due to deaths in the
family), worries "about life," mood swings, panic attacks, and "intense fear" accompanied by
difficulty breathing, racing pulse, shakiness, lightheadedness, and nausea.  (Tr. 805-806).
Craddock also reported that he would not go to some hospitals because they abused their power
and would "put a needle in me because I'm schizophrenic."  (Tr. 805).  He also reported auditory
hallucinations but stated he could not make out what the voices were saying, although they were
loud and yelling.  *Id.*  Regarding his physical health, Craddock indicated he had congestive heart
failure, hypertension, GERDS, and diabetes.  *Id.*

The counselor observed that Craddock was alert, fully oriented, and cooperative, and had
avoidant eye contract, a flat affect, a depressed mood, normal speech, and logical and linear
thoughts.  (Tr. 807).  She noted that Craddock was given a rule-out diagnosis for the bipolar type

---

[4] Corrections Health Wellness, during Craddock's treatment, changed its name to Signature Health.  For
clarity, it will be referred to as "Corrections" throughout Craddock's treatment period.  (*See* Tr. 800).

of schizoaffective disorder because it was not clear if his increased energy was from a baseline or from his depressed feelings. (Tr. 808). Craddock was diagnosed with a schizoaffective disorder of a depressive type, severe alcohol use disorder, and severe cannabis use disorder. (Tr. 809).

On March 30, 2017, Craddock was seen at Lutheran Hospital with complaints of ankle swelling. (Tr. 672). On physical examination, he was generally normal, including in his mood and affect, but did have edema on his legs. (Tr. 673-674). He was advised on how to manage his edema and was discharged in stable condition. (Tr. 674).

On March 31, 2017, Craddock had a meeting with Connections to discuss his medical conditions and housing situation; he was noted as cordial and having a flat affect. (Tr. 815-817).

On April 3, 2017, Craddock was seen at Lutheran Hospital, reporting that his medication was causing him to be dizzy and lightheaded, and he had fluid build-up in his legs. (Tr. 669). On examination, he was, generally, normal and it was noted that he did not have any significant ankle swelling or pitting edema on his legs. (Tr. 670-671). He was instructed not to stop taking his mental health medication until meeting with his psychiatrist or counselor. (Tr. 671).

On April 5, 2017, Craddock was seen at MetroHealth Hospital, reporting that he wanted to discontinue his medication because it caused his ankles to swell. (Tr. 546-547). On physical examination, he was, generally, normal except for bilateral mild pitting ankle edema. (Tr. 548). Craddock was advised to follow-up with his psychiatrist and return if his symptoms changed or worsened. (Tr. 549). On his discharge, it was noted that Craddock became very confrontational, yelled at one of the nurses, refused to take his paperwork, and walked out of the room. *Id.*

On April 6, 2017, Craddock informed the staff at his housing unit that the doctor at MetroHealth had discontinued his medication but, when asked for documentation to that affect, Craddock asserted the doctor did not provide any and refused to let staff confirm the change with

his doctor.  (Tr. 606).  Craddock also refused to see the psychiatric department at Lutheran Hospital and was discharged from the housing program.  (Tr. 606-607).

On April 6, 2017, Craddock met with Connections staff, who reported that he was agitated.  (Tr. 818-819).  They discussed how psychiatric medication was required for housing eligibility; Craddock stated he would stay on the street to avoid a shelter.  (Tr. 819).

On April 6, 2017, Craddock was also seen at Lutheran Hospital, but was transferred to the Cleveland Clinic's behavioral health unit.  (Tr. 660-661, 666).  Craddock reported that he heard multiple, loud, screaming voices, which worsened when he stopped his medication. (Tr. 666).  He reported being cleared by his cardiologist to stop one of his medications and did so but sought admission because he had no more medication and did not feel safe at home with the intensity of the voices.  *Id.*  He was admitted and observed to be alert, fully oriented, well groomed, cooperative, making poor eye contract, and to have a blunted affect.  (Tr. 668-669).

From April 7 to April 19, 2017, Craddock was hospitalized at a Cleveland Clinic hospital.  (Tr. 656).  Although initially worse on his arrival, over the course of his stay, Craddock was generally found to be appropriate in his behavior, well groomed, fully oriented, normal in his speech, euthymic in his affect, and coherent with somatic focus in his thought process, and to have fair insight, limited judgment, intact memory and cognition, and normal in his psychomotor activity.  (Tr. 622-623, 627, 629, 631, 635-637, 640, 643, 645, 647-650, 657).  He was noted as having had auditory hallucinations until April 16, when they were noted to have resolved and none were noted afterwards.  *Id.*  It was reported that Craddock's behavior was considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment. *Id.*

During his Cleveland Clinic stay, staff routinely observed that Craddock was stressed by his health problems, particularly the auditory hallucinations, and his housing situation, but was generally social with peers.  (*See* Tr. 625-658).  He was occasionally observed to exhibit irritable or angry behavior, even at one point lunging towards a male peer and threatening violence. (Tr. 638-639).  He also expressed frustration with others leaving the facility or the mental health care system, asserting that his treatment was due to his race.  (Tr. 651, 653).  On his discharge, Craddock reported feeling better, and he was noted as being fully oriented and having appropriate behavior, normal speech, a euthymic mood, logical thought content and form, limited insight and judgment, intact memory/cognition, and normal psychomotor activity.  (Tr. 657).

On April 14 and 18, 2017, while hospitalized, Craddock met with Connections staff, and was initially noted as being cordial, but later, when discussing his discharge, was reported as being aggressive and sarcastic toward other patients and staff.  (Tr. 823-825).

From May 8 to November 27, 2018, Craddock met with and was treated by Connections staff.  (Tr. 826-933, 937-949, 1068-1091, 1096-1107, 1110-1119, 1126-1151).  Generally, Craddock's meetings with staff addressed his medical and housing needs, and the staff noted his openness and appreciativeness in discussions.  *See id*.  However, he often expressed concerns about the security of his housing, the behavior of other individuals there, that the staff was withholding his mail or changing his medication, or that the SSA was purposefully slowing down his process.  (*See* Tr. 850, 864, 880, 885, 892, 894-895, 899, 909, 911, 927).  On other occasions, he was noted as becoming angry, agitated, and insulting towards the staff, such as stating that a staff member was "playing God" or filing grievances and hanging up on staff when paperwork was misfiled.  (*See* Tr. 826, 903-904, 941-942, 945-947, 1086, 1090-1091).

Occasionally during this period, the Connections staff assessed Craddock's mental health. (*See* Tr. 812-813, 916-917, 921-923, 927-929, 1139-1141).  The nurses, generally, observed that Craddock was cooperative, fully oriented, and had a normal appearance, normal speech, a sad or depressed mood, a constricted affect, a linear or logical thought process, persecutory thought content or paranoia, normal speech, intact memory, fair insight and judgment, normal cognition, and an average intellect.  *Id*.  He was routinely noted as reporting auditory hallucinations, and, occasionally, visual hallucinations.  *Id.*  Improvements were sporadically noted, either being reported by Craddock or by the staff noting he agreed to get back on medication or did not appear internally stimulated.  (*See* Tr. 912, 919, 921).

On November 28, 2018, the Cooperative Disability Investigation Unit, connected to the state disability agency, was referred Craddock's name for an investigation.  (Tr. 950, 952).  It reported that, "[a]lthough CRADDOCK frequently complains of hallucinations and suicidal thoughts in order to gain admission to the hospital, staff does not observe psychotic or mood symptoms while is in the hospital."  (Tr. 954).  It recounted inconsistent statements by Craddock as to whether he had a history of hallucinations and paranoia and that, while imprisoned in 2007, Craddock had not been on the prison's mental health caseload.  *Id.*  It also noted that multiple medical sources raised the question of whether Craddock's symptoms evidenced malingering, and that at a prior in-unit competency evaluation, the institution felt that Craddock's intimidating behavior was deliberate and not due to a mental disease.  (Tr. 954-955).  The investigator also reviewed Craddock's Facebook usage, which had thousands of friends and frequent posts.  *Id.*

The investigator spoke with Craddock, noting that he used public transportation and cared for his personal hygiene needs.  (Tr. 955).  Detectives also went to Craddock's residence, and there the group home manager also provided that Craddock lived alone, was self-sufficient,

and had no assistance with his daily living needs.  (Tr. 956).  They also spoke with Craddock for 24 minutes, during which it was noted that he was polite; attentive; cooperative; articulate; displayed no outward signs of anxiety, depression, or paranoia; and did not display any apparent abnormalities in his behavior or his ability to understand and answer the questions.  *Id.*

On December 11, 2018, Craddock met with Connections staff to discuss his housing needs and doctors' appointments; he was noted as being engaged.  (Tr. 1112, 1114).

On December 17, 2018, Craddock met with Connections staff.  (Tr. 1068, 1116, 1145). In his individual session, Craddock expressed difficulties he'd had at prior group homes and discussed his housing needs.  (Tr. 1068, 1116).  During a subsequent mental health evaluation, he recounted being stressed about his housing, noting that another resident was assaulted, and that he felt he should move out but was dealing with the situation by filing grievances rather than lashing out.  (Tr. 1145-1146).  He was observed to be alert and oriented, and had mild impairments in his attention and concentration; a pleasant euthymic mood; a full range of affect; some mood lability in response to irritating or frustrating individuals; linear, organized, coherent, and logical thought process; chronic intermittent auditory and visual hallucinations; average fund of knowledge; grossly intact memory; good insight; and fair judgment.  (Tr. 1147).

On December 19, 2018, Craddock had a psychiatric follow-up with Connections. (Tr. 1004).  He was observed to be alert, make good eye contract, and had an irritable mood, intact attention and concentration, normal speech, organized coherent thought process, average fund of knowledge, intact memory, fair insight and judgment, and depression, which he rated as 8 out of 10.  (Tr. 1005-1006).  He was also noted as having persecutive feelings, such as medical professionals treating him "like an experiment" or not caring about his health.  (Tr. 1005, 1007).

16

He also endorsed auditory and visual hallucination three to four days out of the week, but did not appear internally stimulated and had no frank delusions voiced. *Id.*

On December 27, 2018, Craddock met with Connections staff, exhibiting anxiety and yelling and screaming, until finally speaking with a supervisor. (Tr. 1088).

On January 7, 2019, Craddock met with Connections staff, and they discussed his medical appointments and paperwork; he was noted as alert and oriented. (Tr. 1108).

On January 7, 2019, Eulogio Sioson, M.D., evaluated Craddock's physical conditions. (Tr. 996). Craddock reported being short of breath after walking 15 minutes in normal weather and after 5 minutes in hot weather, being able to climb 2 flights of stairs, and being able to lift and carry 10 pounds. *Id.* On physical examination, Dr. Sioson noted that Craddock could walk normally without an assistive device and get up and down from the examining table fine. *Id.* Generally, he found that Craddock was physically normal, and manual muscle testing demonstrated that he had some reduced range of motion in his dorsolumbar spine, but otherwise had only mild flexion limitations. (*See* Tr. 996, 998-1000). His heart sounded regular, his lungs sounded normal, his extremities appeared normal, and Craddock was alert, coherent, oriented, cooperative, and did not have any sensory deficits. (Tr. 997). Dr. Sioson's impression was that Craddock did not have any overt congestive heart failure, his diabetes was nearly corrected on medication, he had no apparent peripheral neuropathy, he was not emotionally labile and was able to maintain attention. *Id.* He found that there were no objective findings, based on the testing, that would significantly affect Craddock's work-related activities. *Id.*

From January 9 to July 11, 2019, Craddock met with Connections staff. (Tr. 1030-1067, 1092-1095, 1108-1109, 1120-1125). Most times, he discussed his medical or housing needs with the staff or looked at different homes, and was noted to have been engaged and exhibited good

17

insight in asking questions about the various homes.  *See id.*  In discussing his needs, he would sometimes become angry with the staff, such as becoming upset over an accidently erased appointment or asserting it was the counselor's job to choose his housing.  (*See* Tr. 1059, 1122-1123).  During his last session, he also mentioned that he wanted to be "busier with his life" and use his culinary arts certificate.  (Tr. 1061).

On April 29, May 31, and June 28, 2019, during this period of treatment, Craddock underwent additional psychiatric follow-ups.  (Tr. 1009-1026, 1052-1055).  On physical examination, he was noted as being normal.  (Tr. 1010, 1017-1018).  As to his mental condition, he endorsed visual hallucinations and was observed to be oriented, cooperative, appropriate in his attention and concentration, "seemingly anxious," normal in his speech, linear and circumstantial in his thought process, and appropriate in his associations.  (Tr. 1011-1012, 1018-1019).  He was also observed to have an average fund of knowledge, intact memory, and "seemingly poor" insight and judgment.  (Tr. 1011-1012, 1018-1019).  He indicated in both sessions that he was not taking his psychiatric or heart medication because of adverse reactions.  (Tr. 1013, 1020).  In both sessions, he also indicated there were no weapons in his home.  *Id.*

In his later session, Craddock was noted to be in the same condition, except he was preoccupied with his situation and mistreatment, seemingly paranoid, anxious, and irritable, and he had increased rate, tone, and volume in his speech.  (Tr. 1023-1026).  Craddock reported that he was back on some medication, and the staff observed that he was in a good mood, and his symptoms were "partially controlled," but he had some irritation due to scheduling errors.  (Tr. 1027).  When asked if he had weapons in his home, however, he asserted he had never been asked that before, became irritated, and accused the staff of being racist.  *Id.*  He also asserted he had a right to his medical records and that the providers were lying to him and mistreating him

18

because of his race.  *Id.*  Craddock indicated he would like to speak to a supervisor and file a grievance for racism and other slights.  *Id.*

### C.    Relevant Opinion Evidence

#### 1.    State Agency Consultants

On January 5, 2018, Courtney Zeune, Psy.D., reviewed Craddock's mental health records and determined that there was insufficient evidence to determine whether he had any mental health impairments or limitations.  (Tr. 97).  On January 16, 2019, Jamie Lai, Psy.D., concurred with Dr. Zeune's determination.  (Tr. 113-114).

On January 16, 2018, Maria Congbalay, M.D., reviewed Craddock's medical evidence and determined that it was insufficient to reach a determination regarding what, if any, medical impairments or limitations he had.  (Tr. 96).  On January 14, 2019, Maureen Gallagher, D.O., M.P.H., concurred with Dr. Congbalay's determination.  (Tr. 112-113).

### D.    Relevant Testimonial Evidence

Craddock testified at the hearing.  (Tr. 51-63).  He testified that he suffered from both depression and a form of schizophrenia.  (Tr. 51).  He had experienced paranoid episodes because of his schizophrenia, which happened about four times a day, and he would hear voices and see black things, like shadows.  (Tr. 51-52).  Because of these episodes, Craddock isolated himself.  (Tr. 52).  He initially said he did not like being around people because "I just don't," but then explained that he did not like being around judgmental people or people who "look[ed] down" on him because of his mental health issues and could become verbally confrontational. (Tr. 52-53).  He indicated it happened a lot when he was around people.  (Tr. 53).  He endorsed having catatonic states when he would just be in his house watching television.  *Id.*  He did not go outside too often, but he would go to the store.  *Id.*

19

Craddock also testified that he had issues with depression, which he appeared to indicate was constant, saying he would "stay depressed." (Tr. 54). Anything he could not do for taking care of his living conditions, the group home owner could resolve, and he obtained transportation from Connections. *Id.* He indicated that he was then living in a group home with just the owner and that he had previously been at a home with more people, but he had "major" issues with them. (Tr. 54-55). He explained that he "didn't like people getting mistreated," saying they were "eating out of garbage cans," the staff members shot at a client, and he had a "big issue with that." (Tr. 55). He would have a hostile reaction, where he was "ready to fight" and would yell, which "put [him] in a state of paranoi[a]." *Id.* He specified that this only occurred around "people that do people wrong and judgmental people." *Id.* Regarding his physical conditions, Craddock testified that he had trouble walking when it was hot outside because he would have shortness of breath and fatigue. (Tr. 56). He was also diagnosed with congestive heart failure in 2015, which caused shortness of breath, fatigue, and swelling in his right eye. *Id.*

The ALJ directed Craddock's counsel to ask him about several findings from his prior disability decision, including the Continuing Disability Investigations Unit report. *Id.* Craddock testified that he had recently "gone off" and gotten upset, irritable, paranoid, and anxious with the staff at Connections, asserting they were not providing services and they had a "verbal dispute." (Tr. 56-57). He endorsed that his mood would change from one extreme to the other. *Id.* He explained that, if he knew someone was doing something wrong to him or he was not being respected, he would get upset and that could last for the whole day. *Id.* When he would become upset, he would "talk very, very loud. If it's yelling, I talk very loud. People just don't know." (Tr. 58). He testified that "a lot of time" he did not have much energy and coffee would

only help a little.  *Id.*  He had been prescribed medication that affected his heart rate and pressure, which had been stopped, but he was sensitive to many medications.  *Id.*

Craddock testified that, without the medications, he was paranoid the majority of the time, constantly thinking of his health or that people were out to get him.  (Tr. 58-59).  He stated that he felt paranoid sitting in the hearing, stating "[t]hat's my diagnosis, schizophrenia.  Like I said, when I'm around people, I have like a – I'm paranoid.  When I'm around people.  I like to be to myself.  I like to be in my home."  (Tr. 59).  He stated that the group home owner took care of the shopping, cooking, and cleaning, but he could take care of his personal hygiene. (Tr. 59-60).  He had last worked in 2014 for a temp service, through which he cleaned a baseball stadium.  (Tr. 60).  It involved climbing stairs, bending, picking up trash, sweeping, and mopping, which he could no longer do, in part because of his heart condition.  *Id.*

Craddock testified that his eye was a little swollen, but he could see with his glasses. (Tr. 61).  He had "very low" social skills, which he described as not liking to communicate.  *Id.* He also slept for six hours a night but would sometimes have nightmares.  (Tr. 61-62).  He would also sometimes get confused, forget appointments, or have trouble making appointments, which was why he had his case manager pick him up.  (Tr. 62-63).  He had also previously been in fights and he did not trust the flu vaccine.  (Tr. 63).  The ALJ asked Craddock and his counsel if there was any explanation of the state investigation, and neither was aware of it.  (Tr. 68).

## III. Law & Analysis

### A. Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Under this

standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").  But, even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595, at *16 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

### B.    Step Three: Medical Listings 12.04 and 12.06

Craddock contends that the ALJ misevaluated his depression and schizophrenia under Listings 12.04 and 12.06, respectively.  ECF Doc. 14-1 at 5-8.  As to Listing 12.04, Craddock argues that his depression met the listing's Paragraph A and B criteria because of the number of symptoms he had that were continuous or intermittent.  ECF Doc. 14-1 at 6-8.  As to Listing

12.06, Craddock argues that he met the Paragraph A and B criteria because he was distressed from recurrent and intrusive recollections of traumatic experiences with his schizophrenia.  ECF Doc. 14-1 at 5-8.  The Commissioner disagrees.  ECF Doc. 16 at 4-6.

At Step Three of the sequential evaluation process, a claimant has the burden to show that he has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant meets all of the criteria of a listed impairment, he is disabled; otherwise, the evaluation proceeds to Step Four.  20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").  In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review."  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision).  "A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing."  *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641-42 (6th Cir. 2013)).  "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing."  *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).  "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three."  *Id.* at 433; *see also Forrest v.*

*Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (finding harmless error when a claimant could not show that he could reasonably meet or equal a listing's criteria).

Listing 12.04 establishes the criteria for affective disorders, while Listing 12.06 establishes the criteria for anxiety-related disorders. *See* 20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.04; 12.06. In order to meet either Listings' required level of severity, the claimant must show that he meets: (1) the impairment-specific medical criteria in Paragraph A; and (2) the functional limitations criteria in Paragraphs B or C. 20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.00(A), 12.04, 12.06.

To meet Paragraph A for affective disorders covered under Listing 12.04, the claimant must show medical documentation of:

(1) Depressive disorder, characterized by five or more of the following:
(a) depressed mood; (b) diminished interest in almost all activities; (c) appetite disturbance with change in weight; (d) sleep disturbance; (e) observable psychomotor agitation or retardation; (f) decreased energy; (g) feelings of guilt or worthlessness; difficulty concentrating or thinking; or (i) thoughts of death or suicide[; or]

(2) Bipolar disorder, characterized by three or more of the following:
(a) pressured speech; (b) flight of ideas; (c) inflated self-esteem; (d) decreased need for sleep; (e) distractibility; (f) involvement in activities that have a high probability of painful consequences that are not recognized; or increase in goal-directed activity or psychomotor agitation.

20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.04(A).

To meet Paragraph A for anxiety-related disorders under Listing 12.06, the claimant must show medical documentation of:

(1) Anxiety disorder, characterized by three or more of the following:
(a) restlessness; (b) easily fatigued; (c) difficulty concentrating; (d) irritability;
(e) muscle tension; or (f) sleep disturbance[;]

(2) Panic disorder or agoraphobia, characterized by one or both: (a) panic attacks followed by a persistent concern or worry about additional panic attacks or their consequences; or (b) disproportionate fear or anxiety about at least two different

situations (for example, using public transportation, being in a crowd, being in a line, being outside of your home, being in open spaces)[; or]

(3) Obsessive-compulsive disorder, characterized by one or both: (a) involuntary, time-consuming preoccupation with intrusive, unwanted thoughts; or (b) repetitive behaviors aimed at reducing anxiety.

20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.06(A).

The Listings share the same Paragraph B and C criteria.  To satisfy Paragraph B, the claimant must show that his mental health condition resulted in an "extreme limitation of one or marked limitation of two, of the following areas of mental functioning: (1) understand, remember or apply information; (2) interact with others; (3) concentrate, persist or maintain pace; (4) adapt or manage oneself."  *See* 20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.04(B); 12.06(B).  To meet the criteria for Paragraph C, a claimant must show that he had a:

Medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both: (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the] mental disorder; and (2) marginal adjustment, that is, [the claimant has] minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [his] daily life.

*See* 20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04(C); 12.06(C).

The ALJ applied the proper legal standards and reached a determination supported by substantial evidence in determining that Craddock did not meet or medically equal Listings 12.04 or 12.06.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Craddock contends that he satisfied both the requirements of Paragraph A *and* Paragraph B for Listings 12.04 and 12.06; he does not contest the ALJ's Paragraph C findings.  *See* ECF Doc. 14-1 at 5-7.  The ALJ did not address whether Craddock's medical evidence met the requirements of Paragraph A for either Listing. (*See* Tr. 14-16).  However, because a claimant must show that he meets *both* the Paragraph A and Paragraph B criteria in order to found disabled under Listing 12.04 and/or 12.06, once the

ALJ determined that Craddock did not meet the Paragraph B criteria, Craddock could not qualify as disabled at Step 3, provided the ALJ's Paragraph B conclusion was supported by substantial evidence.  *See Kobetic v. Comm'r of Soc. Sec.,* 114 F. App'x. 171, 173 (6th Cir. 2004) (reasoning that remand is not required when it "would be an idle and useless formality" (quoting *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 766 n.6 (1969)).  Here, the ALJ met his obligations in reviewing Craddock's mental health conditions under the Listings.  Specifically, the ALJ (i) addressed all of the specific Paragraph B areas of functioning, (ii) addressed the Paragraph C criteria, (iii) noted Craddock's subjective statements regarding the areas of functioning, (iv) compared Craddock's statements to the medical evidence; and (v) provided citations, albeit not many, to the evidence supporting his conclusion that Craddock had only mild to moderate limitations.  *See Reynolds,* 424 F. App'x at 416; (Tr. 15-16).  With such detail, the ALJ satisfied each of his regulatory obligations and provided sufficient explanation for meaningful review.  *See Reynolds,* 424 F. App'x at 416; 20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04; 12.06.

Substantial evidence supports the ALJ's conclusion that Craddock did not have marked limitations in the three challenged areas of functioning under Listings 12.04 and 12.06 (Craddock's social functioning, ability to adapt, and maintaining concentration).  42 U.S.C. § 405(g); *Rogers,* 486 F.3d at 241.  First, as to his moderate limitations in interacting with others, such evidence includes: (i) records indicating Craddock was cooperative and participated in his counseling sessions, (Tr. 519, 529-530, 668-669, 711-712; 807, 812-813, 826-933, 937-949, 1068-1091, 1096-1107, 1110-1119, 1126-1151); (ii) records indicating he socialized without incident with others in his shelters or group homes, (Tr. 491, 494-497, 500-501, 625-658); and (iii) records indicating he was cordial or engaged, (*see e.g.,* Tr. 815-817, 823-825 1030-1067,

1092-1095, 1108-1109, 1120-1125); and (iv) the lack of records indicating he struggled to communicate. *Biestek*, 139 S. Ct. at 1154.

Additionally, substantial evidence supported the ALJ's finding of moderate limitations in Craddock's ability to adapt and manage himself, which the ALJ supported by referencing his daily activities. It should be noted that not every piece of evidence identified by the ALJ offers the strongest support for his finding. The ALJ noted that Craddock had "no problems with temper control." (Tr. 16). Based on the records summarized above, the ALJ's unequivocal statement is concerningly overbroad because it ignores evidence of several recorded outbursts. Nevertheless, even striking that portion of the ALJ's finding from consideration, substantial evidence supported the ALJ's conclusion that the medical evidence and Craddock's daily activities did not demonstrate that he had a marked limitation in his ability to regulate his emotions, control his behavior, or maintain his well-being in a work setting. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(E). Such evidence includes: (i) treatment notes indicating Craddock appeared well groomed or had good hygiene, (Tr. 507, 529, 622, 631, 635, 637, 640, 643, 645, 647, 649, 657, 668, 688, 711, 812, 922, 929, 1140); (ii) Craddock's statements that he could "do activities he enjoys," live independently, and take public transportation, (Tr. 481, 955-956); (iii) treatment notes indicating Craddock could exhibit good behavioral control (*See e.g.*, Tr. 501, 1145-1146), and (iv) the significant portion of records indicating that Craddock engaged and participated in his care and in resolving his housing circumstances without any issues, (*See e.g.*, Tr. 1030-1067, 1092-1095, 1112, 1114, 1108-1109, 1120-1125). *See Biestek*, 139 S. Ct. at 1154.

Finally, as to the mental functioning area of maintaining concentration, persistence, and pace, such evidence includes the numerous treatment notes indicating Craddock had average

concentration and/or cognition, a normal thought process, fair insight, fair judgment, and intact memory.  (Tr. 507-508, 529, 622-623, 631, 635-637, 640, 643, 645, 647-650, 657, 668, 688, 711-712, 812-813, 922-923, 929, 1140-1141).  The records indicate that Craddock was engaged and participative in his housing process, asked questions and expressed opinions about where he wanted to live.  (*See* Tr. 1031, 1033).  Moreover, there is a lack of evidence demonstrating any cognitive impairments; and Craddock has not cited any specific evidence which would demonstrate the existence of such a limitation.  *See Biestek*, 139 S. Ct. at 1154; *see generally* ECF Doc. 14-1.

Further, even if the Paragraph C criteria were considered, the ALJ acknowledged support for the existence of Craddock's disorders for at least two years but found that his evidence did not support that he had only a minimal capacity to adapt to changes in his environment or demands not already part of his daily life.  *See* 20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04; 12.06; (Tr. 16).  And the same records regarding Craddock's ability to adapt and manage himself provide substantial evidence in support of the ALJ's conclusion that Craddock failed to meet the Paragraph C criteria requiring that he have only a minimal capacity to adapted to changes in his environment or new demands.  *See* 20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04; 12.06; *Biestek*, 139 S. Ct. at 1154.  As a result, even if a preponderance of the evidence supported Craddock's contention that his limitations were marked, the fact that substantial evidence also supports the ALJ's moderate findings means the Commissioner's decision cannot be overturned on that basis. *See O'Brien*, 819 F. App'x at 416.

## C.     Step Four: Subjective Symptom Complaints

Craddock contends that the ALJ erred in finding his subjective symptoms complaints inconsistent with the record because any inconsistent adherence to a treatment regimen should

have been construed as a symptom of his mental health conditions and his difficulties in navigating the healthcare system.  ECF Doc. 14-1 at 13.  The Commissioner's sparse brief did not address this argument.  *See* ECF Doc. 16 at 6-8.

A claimant's subjective symptom complaints are among the evidence that an ALJ must consider in determining a claimant's RFC at Step Four of the sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or other symptoms may support a claim of disability.").  Generally, an ALJ must explain whether he finds the claimant's subjective complaints consistent with objective medical evidence and other evidence in the record.  SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017); *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (The ALJ must clearly explain his reasons for discounting subjective complaints).  In conducting this analysis, the ALJ may consider several factors, including claimant's efforts to alleviate his symptoms, whether any treatment was effective, and any other factors concerning the claimant's functional limitations and restrictions.  SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).  The regulations do not require the ALJ to discuss each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports his decision.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)); *Simons v. Barnhart*, 114 F. App'x 727,

733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

Although there are many aspects of the ALJ's analysis of Craddock's subjective symptoms complaints that are concerning, Craddock has not demonstrated that these instances were not only erroneous but were also harmful.  And as a result, the court's conclusion must be that any error in the ALJ's decision was harmless and does not require remand.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Here, the ALJ acknowledged his obligation to consider the factors delineated in SSR 16-3p.  (Tr. 17).  And he identified inconsistencies in Craddock's testimony.  (Tr. 19). The ALJ discounted Craddock's mental health complaints because of his: (i) noncompliance with his medication, (ii) the lack of frequent emergency room treatment, (iii) the state disability report's finding that Craddock had a capacity for living alone and could manage his activities of daily living, (iv) the state detectives' explanation that Craddock appeared normal, and (v) Craddock's statements that he could grocery shop, use public transportation, use Facebook, and do some chores around the house.  The ALJ found that these, taken together, undermined the consistency between the treatment record and Craddock's complaints.  (*See* Tr. 19).

However, a problem arises when we look at how clearly these "inconsistencies" connect to Craddock's alleged limitations.  First, as to Craddock's mental health, as Craddock argued, it is concerning that the ALJ relied on Craddock's medication noncompliance and his lack of emergency treatment to discount his subjective complaints given his diagnosed mental health conditions and his housing circumstances.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009) (stating that "ALJs must be careful not to assume that a patient's failure to receive mental-health treatment evidences a tranquil mental state").  The SSA's regulations,

30

although they permit the failure to follow prescribed treatment to be a basis for finding a

claimant's complaints inconsistent, require that ALJs only make such findings after considering

the "possible reasons [the individual] may not comply with treatment or seek treatment

consistent with the degree of his or her complaints." 2016 SSR LEXIS 4, *23.  Moreover,

> [T]o establish a severe mental impairment as an acceptable reason excusing a claimant's
> adherence to a medical regime including prescription psychiatric medications, the record
> must contain evidence *expressly linking* noncompliance with the severe mental
> impairment.  The justifiability of noncompliance is a step four determination as to which
> the claimant bears the burden of proof.

*Burge v. Comm'r of Soc. Sec.*, 2013 US. Dist. LEXIS 180376, at *9 (N.D. Ohio Dec. 26, 2013)

(emphasis added).  In Craddock's case, this analysis creates a close call.  Craddock's noted

instances of noncompliance were often accompanied by statements that he felt that his mental

health medication negatively interacted with his heart medication.  (*See e.g.*, Tr. 546-547, 666,

669).  But he also had medical professionals who instructed him to seek medical advice before

he stopped taking the medication.  (*See e.g.*, Tr. 606-607, 671).  And the ALJ did not provide any

context for why he identified the noncompliance as an inconsistency.

These issues are further complicated by the ALJ's reliance on Craddock's lack of

emergency medical treatment as an "inconsistency."  Unless Craddock had stated that he was

constantly in the emergency room (which he did not), the lack of emergency treatment is just a

fact – not an inconsistency.  And the ALJ never explained why he found this to be an

inconsistency.  Similarly, the detectives' observations that Craddock did not appear to be having

any mental health episodes during their interview is hardly a true inconsistency, given that their

interview was only 24 minutes long.  (Tr. 956).

Further, the ALJ's remaining "inconsistencies" – Craddock's capacity to live alone,

perform his personal care, shop, use public transportation, and use Facebook – are also

31

concerning.  Although a claimant's activities of daily living are unquestionably relevant to the ALJ's RFC determination, (*see* SSR 12-2p, 2012 SSR LEXIS 1, at *4),* the activities noted by the ALJ, do not necessarily equate to the ability to work full time.  As a result, they are not necessarily inconsistent with Craddock's disability contention.  *Cf. Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 864 (6th Cir. 2011) (finding that the claimant's testimony that she could grocery shop, go to the pharmacy, attend church, prepare meals, dress herself, and drive 30 minutes per day were "hardly consistent with eight hours' worth of typical work activity"); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248-49 (6th Cir. 2007) (concluding similarly with respect to claimant's testimony that she could drive, clean, care for two dogs, do laundry, read, do stretching exercises, and watch the news).  To make matters worse, the ALJ also offered an inappropriate character critique when he stated that "[t]he claimant's lack of consistency with employment at any job for a long duration suggests *a poor work ethic* or an inability to work that cannot be attributed to his impairments."  (Tr. 19, emphasis added).

The Commissioner, albeit regarding the ALJ's RFC finding generally, defends the ALJ's reference to the state disability investigation report and the ALJ's reliance on its comments saying, "neither the investigators nor the ALJ found that Claimant's Facebook use meant he could work full time."  ECF Doc. 16 at 7.  Although strictly true, the Commissioner appears to be splitting hairs.  True, the ALJ did not directly say that because Craddock used Facebook he could work full time.  But the ALJ did say that because he used Facebook, Craddock's complaints were inconsistent, which in turn supported the ALJ's determination that Craddock was not disabled.  This "nuance" appears even more strained in light of the paragraph the ALJ devoted almost exclusively to rehashing the investigation's findings compared to the three-line, single sentence devoted to his psychiatric assessments.  (*See* Tr. 18-19).  The Commissioner's

strict construction of the ALJ's decision it noted, but it cannot be offered in place of a legitimate argument.

Although the ALJ's analysis raises a host of concerns, it is not the end point of the court's analysis.  The Commissioner must adhere to its own procedures.  *Rabbers,* 582 F.3d at 654.  But the failure to do so constitutes only harmless error unless the claimant has been prejudiced or deprived of substantial rights.  *See id.*; *see also Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) ("[H]armless error analysis applies to credibility determinations in the social security context.").  Under the regulations, it is ultimately Craddock's burden to demonstrate the consistency of his complaints with the record evidence and the harmfulness of any error.  *Rabbers,* 582 F.3d at 652.  But Craddock has not done so.  *See generally* ECF Doc. 14-1. Instead, Craddock only specifically mentions that his inconsistent treatment should be considered a symptom of his mental health conditions, relying on general allegations that he had difficulty understanding and navigating the health care system.  *See* ECF Doc. 14-1 at 13.  This is insufficient under the regulation because "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment of disability."  SSR 16-3p, 2016 SSR LEXIS 4, at *3.

And, looking at the ALJ's decision as a whole, the ALJ adequately discussed Craddock's subjective complaints elsewhere in his decision, specifically in evaluating Craddock's mental health conditions under the listings, as noted above.  *See Bovenzi v. Comm'r of Soc. Sec.*, No. 1:20-CV-00185, 2021 U.S. Dist. LEXIS 64165, at *34-36 (N.D. Ohio Jan. 28, 2021) (finding that the ALJ's error in failing to discuss the intensity, persistence, and limiting effects of the claimant's symptoms was harmless because the ALJ adequately discussed the symptoms elsewhere in the opinion); (Tr. 15-16).  There, as to each of the areas of mental functioning, the

ALJ noted Craddock's related allegations, if any, for example, noting that Craddock alleged difficulty getting along with others but was described as pleasant and cooperative.  (Tr. 15-16). The ALJ also noted Craddock's lack of complaints related to his ability to remember, understand, or follow instructions or to concentrate, persist, or maintain pace.  *Id.*  And as to the three areas of mental functioning discussed above, the ALJ's analysis was supported by substantial evidence.

This is not to say that the ALJ's analysis of Craddock's subjective symptoms complaints was in any way exemplary.  However, when court examines the ALJ's decision as a whole, we must conclude that the ALJ considered all of the relevant evidence and "that a reasonable mind might accept that evidence as adequate to support the ALJ's [subjective symptom complaint] finding."  *See Bovenzi v. Comm'r of Soc. Sec.*, No. 1:20-CV-185, 2021 U.S. Dist. LEXIS 64165, at *36 (N.D. Ohio Jan. 28, 2021).  Because of its harmless effect, the ALJ's decision in this respect must be affirmed.

Moreover, as discussed above, even if the court were to find that the ALJ erred in handling Craddock's statements about his symptoms, Craddock must do more than identify the alleged mishandling of his subjective complaints.  That is because a disability determination cannot be based only on the claimant's statements about his symptoms.  Rather, the record evidence must also demonstrate the existence of functional limitations that keep a person from being able to engage in work.  *See Curran v. Comm'r of SSA*, No. 1:20-CV-2696, 2022 U.S. Dist. 92678, at *38 (N.D. Ohio Feb. 16, 2022) ("the second step is to evaluate [] the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.").  Here, as discussed above in the evaluation of Craddock's Step Three argument and as demonstrated in the Step Four discussion below,

Craddock has not pointed to record evidence that supports his disability contention. As a result, any error in the ALJ's treatment of Craddock's subjective complaints was harmless error.

### D.    Step Four: Residual Functional Capacity

Craddock contends that the ALJ misevaluated his RFC by finding he could perform work above the sedentary exertional level.[5] ECF Doc. 14-1 at 8-9. He asserts that because his doctors were found persuasive and concluded he was unable to lift more than 10 pounds, unable to stand and walk for more than 2 hours in an 8-hour workday, and unable to stoop, their opinions should be given controlling weight. ECF Doc. 14-1 at 9. Based on Craddock's prior work experience, he contends that his physical and mental health limitations further "erode" the sedentary exertional level. ECF Doc. 14-1 at 9-12. He asserts that Craddock's investigation by the state disability authority's investigators was immaterial, because the investigators have no medical training, and his use of social media was unrelated to his limitations. ECF Doc. 14-1 at 12-13. The Commissioner disagrees, adding that the state disability authority's investigation was irrelevant because the ALJ did not rely on it. ECF Doc. 16 at 6-8.

As noted above, at Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an assessment of a claimant's ability to do work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R.

---

[5] Craddock presents this contention as a challenge to the Medical-Vocational Rules ("the Grids"). *See* ECF Doc. 14-1 at 2, 8-10. However, that analysis does not apply when a claimant has significant non-exertional limitations, such as those resulting from mental health impairments that further reduce his RFC. *See Revis v. Sec'y of Health & Human Servs.*, 762 F.2d 1010, 1985 U.S. App. LEXIS 14534, *4 (6th Cir.) ("The mental problems are 'nonexertional' and hence not covered by the grid."); *Elson v. Comm'r of Soc. Sec.*, No. 3:11-CV-183, 2011 U.S. Dist. LEXIS 153511, at *31 (N.D. Ohio) (Armstrong, M.J.), ( the grids "take account only of a claimant's 'exertional' impairment" and cannot be applied by rote to claimants with non-exertional limitations), report and recommendation adopted, 2012 U.S. Dist. LEXIS 23467 (N.D. Ohio) (Carr, J.). Consequently, I have construed his contentions as to the RFC generally.

§ 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

The ALJ applied the proper legal standards and reached a determination supported by substantial evidence in determining Craddock's RFC.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  To start, Craddock contends that "Four physicians – Mr. Craddock's current primary care physician, two prior treating physicians and SSA's own medical consultant – have observed limitations that would restrict [him] to sedentary work."  ECF Doc. 14-1 at 9.  However, after an independent review of the record, aside from Dr. Sioson's opinion, none of these opinions appears in the record.  Nor do any records indicate concerns about Craddock's absenteeism, the use of a cane, or any manipulative limitations.  Perhaps they were part of administrative records for Craddock's previous applications; but because they were not presented before the ALJ in this case – or included in the record before the court – we cannot rely on the bare assertion that such records exist as a basis for remand.  *See White v. Comm'r of Soc. Sec.*, 2015 U.S. Dist. LEXIS 157159, at *2 n.1 (E.D. Mich. July 30, 2015) (noting that a district court's review is limited to the administrative record before the ALJ and "the court can consider only that evidence presented to the ALJ.").

But more specifically, Craddock raises of host of limitations he contends he had that would have reduced his ability to work to the sedentary exertional level.  *See* ECF Doc. 14-1 at 9-12.  Starting with those related to his physical functional limitations, he contends that he

could not lift more than 10 pounds, could not stand or walk for more than 2 hours in an 8-hour day, could not stoop, would likely be off-task a significant portion of the day due to his physical symptoms, would likely be absent from work more than accepted, required a limitation to alternate between sitting and standing, and required a limitation associated with the use of a cane or his hands.  *Id.*  As the Commissioner points out, some of these limitations were listed in Dr. Sioson's summary of Craddock's subjective complaints but were not among the doctor's findings.  ECF Doc. 16 at 6; (*see* Tr. 996).  As such, the ALJ would have considered them along with Craddock's other subjective symptom complaints, as discussed above.

Regardless, the ALJ's decision demonstrates that he considered the exertional limitations Craddock had and accounted for them in his RFC.  Specifically, the ALJ noted findings that Craddock was short of breath with exertion, but had a normal gait, was able to heel/toe walk, get on and off an examination table, and rise from a quarter squat.  (Tr. 18).  As noted by the ALJ, although Craddock had a slightly reduced range of motion in his spine, the remainder of his examination results were normal.  *Id.*  The ALJ's limitation to medium work and his specified exertional limitations logically flowed from these findings.  *See Fleischer*, 774 F. Supp. 2d at 877.  Further, those findings were supported by many treatment notes which found Craddock to be, generally, normal in light of his congestive heart failure and other conditions.  *See Biestek*, 139 S. Ct. at 1154; (Tr. 548, 550-551, 673-674, 996, 1010, 1017-1018).

As to the mental health limitations, Craddock contends that he was unable to meet basic productive demands; was unable to respond appropriately to supervision, co-workers, and unusual work situations; was limited in his understanding, remembering, and carrying out of simple instructions; and was limited in adjusting to changes in the workplace.  *See* ECF Doc. 14-1 at 11-12.  The ALJ's summary of Craddock's mental health records is, in some ways,

necessarily limited by the record.  The ALJ focused a large portion of his summary on Craddock's behavior at his various housing situations, which is reflective of a large portion of the records presented to the ALJ.  However, the ALJ wrote little about the comparison between the psychiatric evaluations and the state disability agency's investigation.  (*See* Tr. 18-19).

However, our review of the ALJ's RFC findings is not limited to his summary of the medical evidence in his Step Four analysis; rather, the court must examine the more substantive discussion of the psychiatric findings in the ALJ's Step Three medical listing analysis.  *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) ("[W]e read the ALJ's decision as a whole and with common sense.").  Craddock's challenges align with each area of mental functioning considered by the ALJ in his mental health listings analysis.  As discussed above, the ALJ provided a thorough discussion of Craddock's abilities for each mental functioning area.  And those mild to moderate limitations found provided a foundation by which the ALJ's RFC limitations, including limitations to simple, routine tasks, in a low stress environment, involving superficial social interactions and no interactions with the public, make sense and are supported by the substantial evidence in the record.  *See Fleischer*, 774 F. Supp. 2d at 877; *Biestek*, 139 S. Ct. at 1154.  Accordingly, because the ALJ's RFC for both Craddock's physical and mental health limitations was supported by substantial evidence, it fell within his "zone of choice."  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (recognizing that there is a "zone of choice" within which decisionmakers may reasonably reach contrary decisions and, those decisions cannot be second-guessed by the court).

## IV.    Conclusion

Because the ALJ applied the proper legal standards, or harmlessly erred in doing so, and reached a decision supported by substantial evidence, the Commissioner's final decision denying Craddock's application for SSI is affirmed.

**IT IS SO ORDERED.**

Dated: August 3, 2022

Thomas M. Parker
United States Magistrate Judge